COURT OF APPEALS OF VIRGINIA


Present:  Chief Judge Fitzpatrick, Judge Benton and
          Senior Judge Duff
Argued at Alexandria, Virginia


PAUL ALLEN FRIEDLINE

                                    MEMORANDUM OPINION[*] BY
v.    Record No. 0113-99-4          JUDGE CHARLES H. DUFF
                                         APRIL 4, 2000
COMMONWEALTH OF VIRGINIA


            FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
                    Herman A. Whisenant, Jr., Judge

            John E. Gullette for appellant.

            Marla Graff Decker, Assistant Attorney
            General (Mark L. Earley, Attorney General, on
            brief), for appellee.


     Paul Allen Friedline (appellant) appeals from his

convictions in the Circuit Court of Prince William County for

carjacking, robbery, and using a firearm in the commission of

those two crimes.  Appellant contends the trial court erred when

it admitted evidence pertaining to a burglary and larceny that

occurred the same night and in the same locality as the crimes for

which appellant was convicted.  Finding no error, we affirm the

judgment of the trial court.

---

     * Pursuant to Code § 17.1-413, recodifying Code
§ 17-116.010, this opinion is not designated for publication.

Background

Appellant was charged in connection with the March 8, 1998 carjacking of Cindy Loring, and the robbery of Michael Boyer. During its case-in-chief, the Commonwealth presented evidence tending to prove appellant's involvement in the March 8, 1998 burglary of Dorothy and Scott Register's residence. The trial court overruled appellant's objection to this evidence.

Dorothy Register testified that she left her residence on the afternoon of March 6, 1998, and when she returned on March 9, 1998, she discovered that her house had been burglarized. The perpetrators stole, among other items, seven long guns (rifles and shotguns), two handguns, a holster, a box of ammunition, and some cigars. There was mud all over the interior of the house, and muddy footprints led from the back of the house to the Registers' back fence. There was mud on the fence bordering the Registers' neighbor's property, and Scott Register found a pager approximately one foot from the fence. A trail of muddy footprints on the sidewalk in front of the neighbor's house led to a house under construction where some of the Register's stolen property was subsequently recovered.

Mrs. Register testified that the only light she left on when she left the house on March 6 was in the kitchen. Kevin Hansen testified that he was on the Register's property at 10:00 a.m. on March 8 and saw no evidence of a burglary, but

between 8:00 and 10:00 that evening, he saw a dim light coming from one of the Register's upstairs windows.

Cindy Loring testified that on the night of March 8, 1998, she had stopped her vehicle at a stop sign when two men wearing "white sheets or something"[1] over their heads ran up to her car. One of the men, who was armed with a handgun, broke Loring's driver's side window with the gun and began to hit Loring. Before pulling Loring from the car and fleeing in the vehicle, one of the men stuck a hot object on the back of Loring's neck, leaving a circular-shaped burn.

Jean Hassan and Michael Boyer testified that around 11:00 p.m. on March 8, 1998, they were robbed by two men armed with handguns, each of whom was wearing "a hood or mask" over his head. The robbers took Boyer's wallet, which contained sixty dollars.

Peggy Dixon recalled an incident where appellant and Brian Calvin came to her house between midnight and 1:00 a.m. She stated that it was raining that night and the two men were covered with mud. After Dixon's son refused the men's request for a ride, Calvin made a telephone call from Dixon's house.

Cheryl Richards testified that Calvin called her sometime after 11:00 p.m. on March 8, 1998, and asked her for a ride.

---

[1] Officer Landu testified that Loring reported that the culprits had "white pillowcases or sheets or something white over their faces."

She drove to an agreed location where appellant and Calvin entered the car. Richards testified that the two men were muddy and that they told her to "get them out of there." She drove them to Washington, D.C., where the two men purchased marijuana. On the way to Washington, appellant handed a wallet to Calvin, who threw it out of the car. The men also discarded their muddy shoes.

Upon returning from Washington, appellant and Calvin directed Richards to drive them to a house under construction, which appellant and Calvin then entered and exited several times. Richards testified that appellant and Calvin argued about the fact that something they were looking for was not there. She noted that appellant was carrying a bag that was similar in appearance to a pillowcase.

Richards later dropped off appellant and Calvin at Eric Stokes' residence. Upon cleaning the interior of her vehicle, Richards discovered a holster and a box of ammunition under her car seats.[2] Calvin subsequently called Richards and told her that he had left something "hot" in her car.

Stokes testified that when appellant and Calvin arrived at his house, they were wet and muddy. Calvin related to Stokes how he and appellant had carjacked a woman, and described how he had broken the woman's car window with his gun. Calvin also

_____

[2] Richards testified that she disposed of these items.

- 4 -

told Stokes about subsequently robbing a couple.[3]  Stokes

indicated that Calvin and appellant told him about stealing guns

and an ammunition box from a house that night.

Shortly after midnight on March 9, 1998, and approximately

one hour after responding to the Loring carjacking scene,

Officer Landu discovered some of the Registers' stolen property

at the house under construction.  Landu testified that it had

been raining all night and that the property around the house

under construction was extremely muddy.  The Registers' two

handguns, the holster, the ammunition box, and the cigars were

not among the items recovered.

Detective McClellan testified that the Register house was

approximately two blocks from the house under construction where

the Registers' property was recovered.  The house under

construction was approximately one mile from where Loring was

carjacked.  McClellan stated that Loring's car was recovered a

few minutes' drive from the place the carjacking occurred and

that the Hassan/Boyer robbery scene was approximately four

hundred yards from where the police found Loring's car.  During

the course of his investigation, McClellan attempted to have

Richards identify the house under construction where she drove

appellant and Calvin that night.  Although she was unable to

_____

[3] Appellant did not object to this testimony.  See Lilly v.
Virginia, 527 U.S. 116 (1999).

- 5 -

identify the exact house, Richards led McClellan to the street where Landu found the Registers' stolen property in a house.

Dontae Carter was incarcerated with appellant when appellant was served with the carjacking and robbery indictments. Appellant told Carter about a carjacking he had committed, about going back to a house to recover some guns that turned out not to be there, and going to "Eric's" house. Appellant also related that his accomplice had lost a pager.

### Analysis

> Evidence of other crimes or bad acts is inadmissible if it is offered merely to show that the defendant is likely to have committed the crime charged. However, such evidence is admissible if it tends to prove any element of the offense charged, even though it also tends to show that the defendant is guilty of another crime.

Goins v. Commonwealth, 251 Va. 442, 462, 470 S.E.2d 114, 127 (1996) (citations omitted).

Other crimes evidence "is permissible in cases where the motive, intent or knowledge of the accused is involved, or where the evidence is connected with or leads up to the offense for which the accused is on trial." Kirkpatrick v. Commonwealth, 211 Va. 269, 272, 176 S.E.2d 802, 805 (1970).

> Where a course of criminal conduct is continuous and interwoven, consisting of a series of related crimes, the perpetrator has no right to have the evidence "sanitized" so as to deny the jury knowledge of all but the immediate crime for which he is on trial. The fact-finder is entitled to all of the relevant and connected facts,

- 6 -

including those which followed the
commission of the crime on trial, as well as
those which preceded it; even though they
may show the defendant guilty of other
offenses.

Scott v. Commonwealth, 228 Va. 519, 526-27, 323 S.E.2d 572, 577
(1984); see Rodriguez v. Commonwealth, 249 Va. 203, 206, 454
S.E.2d 725, 727 (1995) (evidence of prior crimes admissible
where they "constitute a part of the general scheme of which the
crime charged is a part").

"In addressing the admissibility of other crimes evidence
the court must balance the probative value of the evidence of
the other offenses and determine whether it exceeds the
prejudice to the accused.  The court's weighing of these factors
is reviewable only for clear abuse of discretion."  Pavlick v.
Commonwealth, 27 Va. App. 219, 226, 497 S.E.2d 920, 923-24
(1998) (en banc).  "'[T]he test for admission of evidence of
other crimes is met when there is "a causal relation or logical
and natural connection between the two acts, or they . . . form
parts of one transaction."'"  Bullock v. Commonwealth, 27 Va.
App. 255, 261, 498 S.E.2d 433, 436 (1998) (quoting Guill v.
Commonwealth, 255 Va. 134, 140, 495 S.E.2d 489 492 (1998)).

In Bullock, the defendant was charged with a November 21,
1996 robbery, during which the victim was shot.  A witness for
the Commonwealth testified that on December 31, 1996, he
committed a robbery using a sawed-off shotgun that he borrowed
from the defendant.  See id. at 259, 498 S.E.2d at 434-35.  The

witness further testified that he purchased this shotgun from the defendant on January 6, 1997.  The Commonwealth presented evidence that police recovered the shotgun after it was thrown from a car occupied by the witness and the defendant.  The victim testified that the shotgun looked identical to the weapon employed against him by the defendant during the November 21, 1996 robbery.  See id. at 259, 498 S.E.2d at 435.

We held that the probative value of this evidence outweighed any prejudice suffered by the defendant.  See id. at 263, 498 S.E.2d at 436-37.  The challenged evidence tended to prove that the defendant, who presented alibi evidence, was the perpetrator of the robbery and malicious wounding for which he was charged.  See id. at 262-63, 498 S.E.2d at 436-37.

In Kirkpatrick, the defendant was charged with aiding and abetting the May 20, 1968 robbery of a hotel clerk.  See Kirkpatrick, 211 Va. at 269-70, 176 S.E.2d at 803.  The robber had committed the crime using a sawed-off shotgun.  The robber was subsequently apprehended, with the shotgun, in the defendant's hotel room, but the defendant denied any knowledge of the robber.  See id. at 270-72, 176 S.E.2d at 804-05.  Over the defendant's objection, the Commonwealth presented evidence tending to prove that the defendant stole the shotgun from his former employer on the afternoon of May 19, 1968.  See id. at 271, 176 S.E.2d at 804.

The Supreme Court upheld the admission of this evidence, holding that the evidence was

> "so intimately connected and blended with the main facts adduced in evidence, that they cannot be departed from with propriety; and there is no reason why the criminality of such intimate and connected circumstances, should exclude them, more than other facts apparently innocent."  It is impossible from a fair reading of the evidence in this case to disassociate Kirkpatrick from the theft of the gun that was used in the robbery.

Id. at 276, 176 S.E.2d at 807-08 (citation omitted).

The evidence regarding the Register burglary and larceny tended to prove appellant's involvement in a series of crimes, all of which occurred within a span of a few hours on the night of March 8, 1998, and in close physical proximity to one another.  There was evidence from which the jury could infer that handguns stolen from the Register household were subsequently employed in the carjacking and the robbery and that the circular-shaped burn wound inflicted on Loring was caused by a lit cigar stolen from the Registers' house.  Additionally, the robbery and carjacking victims indicated that the perpetrators had been wearing sheets or pillowcases over their heads, and Richards testified how she saw appellant carrying a pillowcase-like bag that night.

The evidence tending to link these crimes was particularly relevant because none of the victims was able to identify either of the perpetrators.  Appellant did not have the right to

exclude this evidence merely because it tended to prove that he was involved in a crime for which he was not being tried. Accordingly, we hold that the trial court did not err in concluding that the burglary evidence was probative, and did not abuse its discretion when it admitted this evidence because its probative value outweighed its prejudicial effect.[4]

Moreover, even if we assume that the trial court erred by admitting this evidence, any such error was harmless. "In Virginia, non-constitutional error is harmless '[w]hen it plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached.'" Lavinder v. Commonwealth, 12 Va. App. 1003, 1005, 407 S.E.2d 910, 911 (1991) (en banc) (citation omitted). The testimony of Stokes and Carter, coupled with the other non-burglary evidence, was sufficient to prove beyond a reasonable doubt that appellant and Calvin perpetrated the carjacking and the robbery.

---

[4] Appellant contends on appeal that, in addition to his general objection, the scope of the burglary evidence presented, such as the Registers' daughter's reaction to the break-in, and the photographs of the Register home, exceeded that necessary to prove the carjacking and the robbery. Other than posing his general objection to the burglary evidence, appellant did not object to the relevancy of the evidence cited to in his brief. Accordingly, he did not preserve this issue for appeal. See Rule 5A:18.

For the reasons stated above, the judgment of the trial court is affirmed.

**<u>Affirmed.</u>**

Benton, J., dissenting.

Paul Allen Friedline was tried by a jury for the following offenses which occurred on March 8, 1998:  carjacking, robbery, use of a firearm in the carjacking and use of a firearm in the robbery.  Although the trial judge allowed the Commonwealth to prove facts concerning a burglary, that evidence was not relevant to any issue at trial, was unduly prejudicial, and should have been ruled inadmissible.

The evidence proved that on the night of March 8, 1998, in Dale City, two men wearing white material over their heads approached Cindy Loring while she sat in her automobile with a friend.  Loring testified that it was "raining pretty hard." One of the men had a gun and broke a window of her automobile. After hitting Loring, the two men pulled Loring and her friend out of the automobile and drove away in Loring's automobile. Loring did not see the faces of the men and could not identify them.

At eleven o'clock that same night, Jean Hassan and her friend, Michael Boyer, were sitting in her automobile when two men ran to her automobile.  Each man had a handgun and was wearing a white hood over his head.  The men took Hassan's car keys and Boyer's wallet and ran away.  Neither Hassan nor Boyer could identify the robbers.

After 11:00 p.m., Cheryl Richards responded to a telephone call from Brian Calvin and drove to Dale City to meet Calvin and

- 12 -

Friedline.  When they entered her car, they were "muddy" and told her to "get them out of there."  Friedline had a white bag that was "puffed up."  As she drove them to Washington, D.C., Friedline gave Calvin several items, including a wallet.  Calvin threw them out the car window.  Friedline and Calvin also discarded their muddy shoes out the window.

Later, Richards drove Friedline and Calvin back to Dale City and followed their direction to a house under construction.  Both men entered the unfinished house and returned to the car.  They argued because they could not find something for which they were searching.  Richards then drove them to Eric Stokes' residence.

Stokes testified that both men were wet and muddy when they arrived at his residence and that it was raining.  Stokes testified without objection that Calvin told him about several events that occurred that night.  Calvin said he and Friedline pulled a girl out of the car and took her car.  They then drove near Charles Street and robbed another woman and a man at gunpoint.

An inmate who was confined in jail testified that he met Friedline in jail after the robberies.  According to him, Friedline showed him the indictments charging the carjacking and two armed robberies.  He testified that Friedline admitted committing those crimes and described to him how "he went upon a

- 13 -

car . . . [,] got the girl out of the car . . . [and] they took the car."

Over objection, the Commonwealth was permitted to prove facts concerning a burglary that occurred sometime between 4:00 p.m., Friday, March 6, 1998, and the night of Sunday, March 8, 1998. The prosecutor proffered that the evidence of this burglary proved a "common scheme and plan," "opportunity to commit the crime," "intent," and "identity." The trial judge ruled that the burglary evidence was admissible and that "[t]he weight to be given it will be for the [jury]."

The evidence concerning the burglary proved that on March 8, an hour after Loring's automobile was taken, the officer investigating that crime received a report from a resident of Dale City that "suspicious persons [were] in front of his house." The officer went to investigate. He testified as follows:

> I had taken a prior burglary report earlier
> that day. We were informed by a citizen
> that there was -- That whole area is under
> construction. There were some houses that
> were under construction at the time in that
> area and local juvenile young adults had
> been hanging out in the houses and possibly
> that were involved with these burglaries.

The officer went into some of the houses that were under construction and testified that the area was very muddy. He found in one of the unfinished houses a large bag full of guns and other items that he concluded were stolen. He seized the

- 14 -

bag and its contents and recorded them as "found property."  The police did not then know to whom the property belonged.

On Monday, March 9, 1998, at 4:00 p.m., Dorothy Register telephoned the police to report that a burglary had occurred at her residence.  Register left home at 4:00 p.m. on Friday, March 6, and discovered, when she returned on Monday, March 9, that someone had broken into her home.  The burglar had tracked mud throughout the residence and had taken property, including several rifles and handguns.  Thus, the evidence proved that a burglary occurred at the Registers' residence after 4:00 p.m., March 6, and before the police found the Registers' property late Sunday night, March 8.  The Registers' residence is near the houses that were being constructed.

The trial judge erred in permitting the Commonwealth to prove facts concerning the burglary because "[e]vidence that shows or tends to show a defendant has committed a prior crime generally is inadmissible to prove the crime charged."  Guill v. Commonwealth, 255 Va. 134, 138, 495 S.E.2d 489, 491 (1998). "This is because such evidence confuses one offense with the other, unfairly surprises the defendant with a charge he is unprepared to meet, and, by showing that the [defendant] has a criminal propensity, tends to reverse his presumption of innocence of the crime on trial."  Lewis v. Commonwealth, 225 Va. 497, 502, 303 S.E.2d 890, 893 (1983).  Evidence of other crimes may be admitted as an exception to the general rule only

when it is "relevant to an issue or element in the . . . case." Sutphin v. Commonwealth, 1 Va. App. 241, 245, 337 S.E.2d 897, 899 (1985) (citing Kirkpatrick v. Commonwealth, 211 Va. 269, 272, 176 S.E.2d 802, 805 (1970)). "Among other exceptions, evidence of other crimes . . . is allowed if relevant to show the perpetrator's identity when some aspects of the prior crime are so distinctive or idiosyncratic that the fact finder reasonably could infer that the same person committed both crimes." Guill, 255 Va. at 138-39, 495 S.E.2d at 491.

The only contested issue at Friedline's trial was the identity of the men who robbed Loring, Hassan, and Boyer. Indeed, on appeal the Commonwealth notes in its brief that "identity obviously was an issue . . . [and] it was the only real issue in the case." The Commonwealth contends, however, the evidence concerning the burglary was relevant to prove identity and proved "the defendant's role as the criminal agent, by connecting him to the weapons which in turn facilitated the carjacking and robbery."

To support an exception to the rule barring evidence of other crimes, it is not sufficient to assert, as does the Commonwealth, that identity is an issue and then offer evidence of other crimes without proving a logical nexus between identity and the other crimes. To be admissible as evidence of identity, the prior crime does not have to be a "signature" crime, however, it must show "'a singular strong resemblance to the

- 16 -

pattern of the offense charged.'" Spencer v. Commonwealth, 240 Va. 78, 90, 393 S.E.2d 609, 616 (1990) (quoting United States v. Shackleford, 738 F.2d 776, 783 (7th Cir. 1984)). The Commonwealth did not proffer and the evidence did not establish a similarity or pattern between the carjacking and robbery for which Friedline was tried and the burglary of the Registers' residence. The Commonwealth is asking this Court to assume a connection between the crimes based on "sheer speculation, unsupported by the evidence." Tucker v. Life Ins. Co. of Va., 228 Va. 55, 62, 321 S.E.2d 78, 82-83 (1984). No evidence proved, however, that anything about the burglary and the crimes for which Friedline was tried was "'sufficiently idiosyncratic to admit an inference of pattern for purposes of proof,' [and] thus tend[ed] to establish the probability of a common perpetrator." Spencer, 240 Va. at 90, 393 S.E.2d at 616 (citation omitted).

Moreover, even assuming Friedline placed the Registers' property in the unfinished house or discovered the property in the unfinished house after the burglary, those facts do not tend to prove Friedline's identity as one of the persons who robbed Loring, Hassan, and Boyer. No evidence remotely proved that the guns used in the Loring, Hassan, and Boyer robberies were so distinctive that they could only have come from the Registers' residence. The guns the robbers used were neither described by the victims nor recovered by the police. The Commonwealth's

- 17 -

theory is based on a speculative assumption that only the person who committed the burglary of the Registers' residence had possession of handguns.

This country is awash with handguns. It is a rank speculation to assume that an armed robber must have committed a burglary where a gun was taken merely because the robbery occurred near in time and location to the burglary. "Like any other element of a crime, [identity] must be proved as a matter of fact and may not be the subject of surmise and speculation." Guill, 255 Va. at 139, 495 S.E.2d at 492 (citation omitted).

To be admissible under the identity exception, prior crimes evidence must also meet "the further requirement that the legitimate probative value of the evidence must exceed the incidental prejudice caused to the defendant." Id. Friedline contends the evidence lacked any probative value and served only the highly prejudicial purpose of suggesting that he "was likely to commit the crime charged in the indictment." Kirkpatrick, 211 Va. at 272, 176 S.E.2d at 805. I agree. Although Friedline's identity was at issue in the case, the evidence of the burglary at the Registers' residence was not probative of the identity of the men who robbed Loring of her automobile and Hassan and Boyer of their property. Indeed, no physical evidence proved Friedline was ever in the residence and no one testified that he was seen in the residence. Significantly,

Friedline has never been tried for or convicted of committing the burglary.

The same weekend as the Registers' home was burglarized, the police received a report of another burglary in the vicinity of the unfinished houses where the Registers' stolen property was recovered. The Commonwealth does not contend Friedline was involved in the other burglary. The officer who found the Registers' property testified that a citizen told him some "local juvenile young adults had been hanging out in the houses [under construction] and possibly . . . were involved in the burglaries." The officer also testified that the area around the unfinished houses was muddy. Thus, the Commonwealth presented evidence from which the trier of fact could only speculate about who committed the burglary. Although Friedline's friend said that Friedline was wet and muddy when he entered her car, the evidence failed to prove that the mud in the Registers' house came from Friedline. The evidence proved that it was "raining pretty hard" on at least one day that weekend and that the Registers' home is near the muddy construction site where the juveniles, who were suspected of burglaries, were seen. Therefore, from this evidence, the trier of fact could only conclude that anyone walking around in the area could have tracked mud into the Registers' home.

The Commonwealth also argues that Friedline "was intimately connected with . . . a criminal rampage" and "the offenses were

part-and-parcel to 'a course of criminal conduct' which was 'continuous and interwoven.'"  In this case, however, evidence of prior crimes is neither "connected with [nor] leads up to the offense for which the accused is on trial."  Kirkpatrick, 211 Va. at 272, 176 S.E.2d at 805.  Not only is there no evidence of a "criminal rampage," the cases upon which the majority opinion relies to support the theory that the burglary was evidence of a rampage are distinguishable from the present case.

In Bullock v. Commonwealth, 27 Va. App. 255, 498 S.E.2d 433 (1998), the evidence proved that after Bullock robbed and shot the victim using a sawed-off shotgun, he sold the same shotgun to a friend who testified to that effect at Bullock's trial. See id. at 259, 498 S.E.2d at 434-35.  Further, the Commonwealth proved that police recovered the same shotgun after Bullock and his friend threw it from a vehicle which they occupied.  See id. at 259, 498 S.E.2d at 435.  Unlike Bullock, no evidence in this record proved the guns stolen from the Registers' home were used in the robbery or the carjacking.  In addition, no evidence proved that Friedline was ever in possession of the Registers' guns.

In Kirkpatrick, the evidence proved that a robbery was committed using a sawed-off shotgun and that the robber was apprehended in Kirkpatrick's hotel room with the same shotgun in his possession.  See 211 Va. at 270, 176 S.E.2d at 803.  The Supreme Court of Virginia affirmed the trial judge's decision to

allow the admission of evidence that Kirkpatrick had previously stolen the shotgun from his former employer.  See id. at 276, 176 S.E.2d at 807-08.  Thus, unlike in Kirkpatrick, no evidence in this record connected the weapons used in the carjackings or the robberies with the guns stolen from the Registers.

To be admissible, a prior crime must be "'so intimately connected and blended with the main facts adduced in evidence, that they cannot be departed from with propriety.'"  Id.  The majority opinion holds that "[t]here was evidence from which the jury could infer that handguns stolen from the Register household were subsequently employed in the carjacking and the robbery and that the circular-shaped burn wound inflicted on Loring was caused by a lit cigar stolen from the Registers.  I disagree.  As previously stated, to support such an inference, it is not enough to prove merely that guns were stolen from the Registers and that guns were used in the carjacking and robbery. The guns used in the carjacking and robberies were neither identified nor recovered by the police.

Likewise, evidence that cigars were stolen from the Registers certainly does not support an inference that when Loring was burned by an unidentified circular object during a pouring rain, a cigar from the Registers' home caused the burn. Contrary to the majority opinion's suggestion, no evidence in this record tends to prove that the burn wound Loring suffered was caused by a cigar.  Moreover, the further suggestion that,

therefore, the cigar was taken from the Registers' residence is a speculative inference drawn on a speculative inference.

The trier of fact could only speculate whether Loring was burned by a cigarette, a cigar, or some other object carried by one of the robbers during the heavy rainstorm that night. Likewise, the trier of fact could only speculate about the origin of the white pillowcase-like bag that Friedline had when he was in Richards' automobile. No evidence remotely tends to prove it came from the Registers' residence.

Proof of the burglary only served to suggest by innuendo that Friedline committed the burglary and, thus, had a propensity to commit crimes. That evidence had no bearing on the charged robbery and was unduly prejudicial. Therefore, I would reverse the convictions and remand for a new trial.

I dissent.